## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

GIFFORDS,

            Plaintiff,

v.

FEDERAL ELECTION COMMISSION,

            Defendant.

Civ. Action No. 19-1192 (EGS)
CONTAINS HIGHLY SENSITIVE
INFORMATION

### MEMORANDUM OPINION

Plaintiff Giffords—a nonpartisan, nonprofit 501(c)(4) organization headquartered in Washington, D.C.—brings this lawsuit against Defendant the Federal Election Commission ("FEC" or the "Commission") alleging that the Commission has failed to act upon four administrative complaints filed with the agency under the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30109(a)(8)(A). *See* Compl., ECF No. 1 ¶¶ 1–5, 8.[1] Pending before the Court are FEC's motion to dismiss, or in the alternative, for summary judgment, *see* Mem. Supp. Def. FEC's Mot. Dismiss, Alternative, Summ. J. ("Def.'s Mot."), ECF No. 41-1; and Giffords' cross-motion for summary judgment, *see* Mem. Supp. Cross-Mot. Sum. J. & Opp'n ("Pl.'s Cross-Mot."), ECF No. 48.

---

[1] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF page number, not the page number of the filed document.

Upon consideration of the motions, the responses, the replies thereto, the applicable law, and the entire record, the Court **DENIES** FEC's motion and **GRANTS** Giffords' motion.

## I.  Background

### A. Statutory and Regulatory Background

#### 1.    FECA Enforcement

The FEC—an independent agency with six Commissioners—is responsible for enforcing FECA. *See* 52 U.S.C. § 30106(b)(1). Congress enacted FECA to prevent money from corrupting or appearing to corrupt the positions taken by candidates for federal office and those candidates' actions while in office. *See Citizens United v. FEC*, 558 U.S. 310, 344 (2010). FECA provides the Commission with broad investigatory powers in service of that mission. *See* 52 U.S.C. § 30107.

Any person or entity may file a complaint alleging a violation of FECA with the Commission. *Id.* § 30109(a)(1). When a complaint is filed, the FEC notifies the respondents named in the administrative complaint within 5 days, and the respondents are then given an opportunity to respond to the allegations within 15 days. *Id.* § 30109(a)(1)-(2). After the response period has elapsed, taking into account any granted extensions of time to file, the FEC's Office of General Counsel evaluates the submissions and determines whether the matter should be referred to the agency's Alternative Dispute Resolution Office,

Administrative Fine Program, or Enforcement Division, or if it
should be recommended for dismissal. Def.'s Mot., ECF No. 41-1
at 14. If a matter has been assigned to the Enforcement
Division, the assigned staff attorneys prepare and send a report
to the Commission recommending whether it should find that there
is "reason to believe" that the FECA has been violated or
whether it should dismiss the matter. 11 C.F.R. § 111.7. The
FEC's Commissioners then vote on whether the complaint provides
"reason to believe" a violation of the FECA has occurred. 52
U.S.C. § 30109(a)(1)-(2). If the Commission finds no reason to
believe or otherwise terminates its proceedings, the
Commissioners who voted against taking that action should issue
a statement explaining their votes. *Common Cause v. FEC*, 842
F.2d 436, 449 (D.C. Cir. 1988). But if four or more
Commissioners find reason to believe that FECA was or will soon
be violated, then the Commission proceeds to investigate the
alleged violation described in the administrative complaint. *Id.*
§ 30109(a)(2). The Commission is authorized to request answers
to written questions, subpoena documents, and take depositions
during its investigation. *Id.* § 30107(a)(1)-(5).

   At the conclusion of the investigation, the statute
authorizes the FEC's General Counsel to recommend that the
Commission vote on whether there is "probable cause to believe"
that the FECA has been violated. *Id.* § 30109(a)(3). The General

Counsel prepares a report to the Commission recommending what action should be taken. 11 C.F.R. § 111.16. Based on the evidence and additional submissions from the respondents, the Commissioners then vote to determine whether there is "probable cause to believe" that a violation occurred. 52 U.S.C. § 30109(a)(3)-(4). If four Commissioners find "probable cause to believe" that a violation occurred, the General Counsel attempts to arrive at an agreement with the party accused of committing a violation. "This agreement typically involves an admission of violations, a plan for remedial action to correct any violations, and a provision for the payment of civil penalties." *See Citizens for Responsibility & Ethics in Wash. v. FEC*, 164 F. Supp. 3d 113, 117 (D.D.C. 2015). If the General Counsel is unable to obtain an agreement, the FEC has the option of filing suit in federal district court to seek compliance and the imposition of penalties. 52 U.S.C. § 30109(a)(6).

If the Commission determines that no violation occurred or dismisses the administrative complaint for some other reason, the complainant has an opportunity to seek judicial review of that determination. *Id.* § 30109(a)(8)(A). A complainant may also seek judicial review should the Commission "fail to act" on a complaint within 120 days. *Id.* If the court finds that the Commission's dismissal or failure to act was "contrary to law,"

4

the court can "direct the Commission to conform with [that] declaration within 30 days." *Id.* § 30109(a)(8)(C).

### B. Factual Background

The basic facts of this case are not in dispute. In the latter half of 2018, Giffords filed four administrative complaints with the Commission alleging "millions of dollars of illegal, unreported, and excessive political contributions." Compl., ECF No. 1 ¶ 1; Def.'s Mot., ECF No. 41-1 at 20-21; Pl.'s Cross-Mot., ECF No. 48 at 9.

The Campaign Legal Center ("CLC") filed the first of the four administrative complaints with the FEC on July 16, 2018. *See* Compl., ECF No. ¶ 2. The administrative complaint was amended on August 16, 2018, to include Giffords as a complainant. *See id.* The FEC designated the first administrative complaint as Matter Under Review ("MUR") 7427. *Id.* ¶ 56. Giffords and CLC filed a second administrative complaint, designated at MUR 7497, on September 17, 2018, *see id.* ¶¶ 3; and they filed a supplement to the complaint alleging additional facts on February 8, 2019, *see id.* They also jointly filed a third administrative complaint, designated as MUR 7524, on October 22, 2018. *Id.* ¶¶ 60-61. Giffords and CLC filed the fourth and final administrative complaint, designated as MUR 7553, on December 7, 2018. *Id.* ¶¶ 62-63.

The administrative complaints each alleged that two
National Rifle Association of America ("NRA") entities, the NRA
Political Victory Fund ("NRA-PVF") and the NRA Institute for
Legislative Action ("NRA-ILA"), made unlawful contributions to
then-President Trump's presidential campaign and to several
Senate campaigns.[2] See Def.'s Mot., ECF No. 41-1 at 20-21; Pl.'s
Cross-Mot., ECF No. 48 at 9. In particular, Giffords alleged
that "[s]ince at least the 2014 election cycle, the NRA-PFV and
the NRA-ILA have coordinated with candidate campaigns to develop
advertisements through a common vendor, using a shell company
associated with political consulting firm OnMessage," and
"[s]ince at least the 2016 election cycle, the NRA-PVF and the
NRA-ILA have coordinated with candidate campaigns to place
advertisements in complementary fashion, including on the same
stations and programs, using shell companies associated with
media strategy firm National Media." Compl., ECF No. 1 ¶ 32.
Plaintiff alleged that "[b]y coordinating their advertising
strategy in this manner, the NRA-PVF and the NRA-ILA have made
up to $35 million in contributions to candidate campaigns since
the 2014 election, in excess of the contribution limits, in
violation of the source restrictions, and without the disclosure

---

[2] According to Giffords, the candidates for federal office
included Thom Tillis, Tom Cotton, and Cory Gardner in 2014; Ron
Johnson and Donald Trump in 2016; and Matt Rosendale and Josh
Hawley in 2018. See Compl., ECF No. 1 ¶ 10.

required under federal law," including "up to $25 million in
coordinated, illegal contributions to the Trump campaign in
2016." *Id.* ¶ 33.

Within a week of receiving each of the administrative
complaints, the FEC sent the required notification letters to
the respective complainants and respondents. *See* Def.'s Mot.,
ECF No. 41-1 at 21. After granting a number of requests for
extensions of time in which to respond, the Commission began to
receive the responses to the administrative complaints in
September 2018. *Id.* The FEC did not receive the last of the
responses to the administrative complaints until February 21,
2019. *Id.* at 22.

On December 18, 2018, the FEC's Complaints and Examination
and Legal Administration team completed its case ratings on the
first three of the MURs, and the FEC then activated the matters
and assigned a staff attorney. *Id.* The Commission determined
that the matters were to be considered together due to the legal
and factual overlap among the administrative complaints. *Id.*
However, no work was conducted on the matters until January 28,
2019 because of the partial government shutdown, which
furloughed staff from December 22, 2018 to January 25, 2019. *Id.*
In view of the furlough, a revised case activation date of
January 24, 2019 was established for the three matters. *Id.*

7

Regarding the fourth administrative complaint, the FEC activated the matter on February 11, 2019. *Id.*

After the FEC activated all four matters, the agency's Office of General Counsel was ultimately given a deadline of May 24, 2019 to circulate its First General Counsel's Report ("FCGR") to the Commissioners. *Id.* The FCGR—which "made specific recommendations in each of the four MURs addressed, including whether the Commission should find reason to believe violations of FECA had occurred and what if any further actions should be taken"—was submitted on May 10, 2019. *Id.* at 23.

That same month, the Commission met in closed session to discuss how to handle consideration of the FCGR. *Id.* A "tally vote" deadline to either approve the FCGR's recommendations or to set them for consideration at a meeting of the Commissioners in executive session was set for May 22, 2019. Pl.'s Cross-Mot., ECF No. 48 at 10 & n.3. The tally vote was inconclusive, however, and the matters were then scheduled for consideration at the Commission's closed executive session on May 23, 2019. *Id.* at 10. On that day, the Commissioners decided to hold the FGCR for consideration at a future executive session, and the report was again held for future consideration at the June 4, June 20, and June 25, 2019 executive sessions. *Id.* at 10-11. The next executive session in which to consider the report was scheduled for July 9, 2019. *Id.* at 11. However, on July 8, 2019,

then-Vice Chair Matthew Petersen recused himself from the
matters. *Id.* With Mr. Petersen recused, the Commission lost the
required quorum necessary to vote on the matters. *Id.; see also*
52 U.S.C. § 30109(a)(2). Excepting a short period of time that
lasted from June 5, 2020 to July 3, 2020, the FEC did not regain
its quorum until December 2020. *See* Pl.'s Notice Regarding FEC
Quorum, ECF No. 65 at 1-2.

   Once it regained quorum, the Commissioners deliberated on
Plaintiff's administrative complaints on January 26, 2021, and
decided to hold over the matters to the next executive session.
*See* FEC Notice Subsequent Developments, ECF No. 66. On February
9, the Commission again considered the MURs, and, at the
conclusion of the discussion, a Commissioner moved the agency to
find that there was no reason to believe that a violation had
occurred in two of the MURs, 7427 and 7497. *Id.* at 2. The vote
failed 2-3 with one recusal. *Id.* All four matters were then held
over for further consideration at the next executive session.
*Id.* at 2-3.

   At the following session on February 23, 2021, the FEC held
a series of votes related to the four administrative matters.
*See* FEC's Second Notice of Subsequent Developments, ECF No. 67
at 1-2. By a vote of 3-2, the FEC failed to find reason to
believe violations occurred. *Id.* By a vote of 2-3, the FEC also
failed to find *no* reason to believe violations occurred. *Id.* And

by a vote of 2-3, the FEC rejected a motion to close the
enforcement matters, and thereby dismiss Plaintiff's
administrative complaints. *Id.* The Commission met again in
executive session on March 9 and 11, 2021; the administrative
complaints were not on the agenda for that session and were not
called up. *Id.* The parties have not informed the Court of any
action on the administrative complaints since February 23, 2021.
*See generally* Docket for Civil Action No. 19-1192.

### C. Procedural History

Plaintiff Giffords filed this lawsuit on April 24, 2019.
*See* Compl., ECF No. 1. Giffords seeks declaratory and injunctive
relief against the FEC for the alleged failure to timely act on
four administrative complaints Giffords initiated in 2018. *Id.*
¶¶ 55-63. Giffords requests that the Court declare that the
FEC's purported failure to act on its administrative complaints
within 120 days was contrary to law under 52 U.S.C. §
30109(a)(8)(A). *Id.* ¶ 66. Giffords also seeks a court order
compelling the FEC to conform with the declaration within thirty
days after the entry of the Court's declaration. *Id.* at 20 ¶ 2.

On December 6, 2019, FEC filed a motion to dismiss, or in
the alternative, for summary judgment. *See* Def.'s Mot., ECF No.
41. Giffords filed an opposition and cross-motion for summary
judgment on December 23, 2019, *see* Pl.'s Cross-Mot., ECF No. 48;
and FEC filed its reply and opposition on January 13, 2020, *see*

Def.'s Reply, ECF No. 55. Giffords filed its reply on January 21, 2020. Pl.'s Reply, ECF No. 60. On June 1, 2021, the Court granted Giffords' motion to expedite consideration of the parties' cross-motions for summary judgment. *See* Min. Order (June 1, 2021). The motions are ripe for adjudication.

## II.   Legal Standard

"Because no material facts are in dispute, it is appropriate to resolve this matter on summary judgment." *Democratic Senatorial Campaign Comm. v. FEC (DSCC)*, No. 95-0349, 1996 WL 34301203, at *3 (D.D.C. Apr. 17, 1996). Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether a genuine issue of material fact exists, a court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In ruling on cross-motions for summary judgment, a court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Shays v. FEC*, 424 F. Supp. 2d 100, 109 (D.D.C. 2006); *Winston & Strawn LLP v.*

*F.D.I.C.*, No. 061120, 2007 WL 2059769, at *3 (D.D.C. July 13, 2007).

## III.   Analysis

In the context of ruling upon cross-motions for summary judgment regarding a "failure to act" claim under Section 30109(a)(8), the Court must determine whether the Commission acted "contrary to law" in handling the administrative matters. 52 U.S.C. § 30109(a)(8). The standard for determining whether an agency's failure to act is contrary to law is whether its failure to take action is arbitrary and capricious. *Common Cause*, 489 F. Supp. at 744. "Factors the Court may consider in making its determination include the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved." *Id.*; *see also In re Nat'l Cong. Club*, Nos. 84-5701, 84-5719, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984) (per curiam). In addition, it is appropriate for the Court to consider the guidelines the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") outlined in *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions
> must be governed by a rule of reason;
> (2) where Congress has provided a timetable or
> other indication of the speed with which it
> expects the agency to proceed in the enabling

12

> statute, that statutory scheme may supply
> content for this rule of reason;
> (3) delays that might be reasonable in the
> sphere of economic regulation are less
> tolerable when human health and welfare are at
> stake;
> (4) the court should consider the effect of
> expediting delayed action on agency activities
> of a higher or competing priority;
> (5) the court should also take into account
> the nature and extent of the interests
> prejudiced by delay; and
> (6) the court need not find any impropriety
> lurking behind agency lassitude in order to
> hold that agency action is unreasonably
> delayed.

*Id.* at 80 (citations and internal quotation marks omitted).

Although the FEC's decision whether or not to investigate "is

entitled to considerable deference, the failure to act in making

such a determination is not." *DSCC*, 1996 WL 34301203, at *4.

Upon consideration of the *Common Cause* and *TRAC* factors,

discussed below, the Court finds that the FEC has unreasonably

delayed its consideration of Plaintiff's administrative

complaints.[3]

### A. Credibility of the Allegations

The Court finds that the allegations in the administrative

complaints are credible. First, the apparently high priority

---

[3] The Court shall not address Plaintiff's arguments that the
Commission's delay gives rise to the appearance of impropriety
because the D.C. Circuit has explained that courts "need
not find any impropriety lurking behind agency lassitude in
order to hold that agency action is unreasonably delayed." *TRAC*,
750 F.2d at 80 (internal quotation marks omitted).

that the FEC placed on the administrative complaints supports a finding that the allegations are credible. *See DSCC*, 1996 WL 34301203, at *5 (finding plaintiff's allegations credible where the FEC assigned the administrative complaint its highest classification). For example, according to the Commission, after the first response to Plaintiff's first administrative complaint was submitted, the Commission "identified [the first administrative complaint] as a candidate for an expedited track," which would have set a "30-day time goal for drafting and submission of a First General Counsel's Report." Def.'s Reply, ECF No. 55 at 9.[4] Second, the administrative complaints contain "specific documentation of the amounts spent and the purposes of the spending, along with specific evidence" as to the violations alleged. *Citizens for Percy '84 v. FEC,* No. 84-2653, 1984 WL 6601, at *3 (D.D.C. Nov. 19, 1984); *see* Ex. 1 to Pl.'s Cross-Mot., ECF No. 50-4; Ex. 2 to Pl.'s Cross-Mot., ECF No. 50-5; Ex. 3 to Pl.'s Cross-Mot., ECF No. 50-6; Ex. 4 to Pl.'s Cross-Mot., ECF No. 50-7; Ex. 5 to Pl.'s Cross-Mot., ECF No. 50-8; Ex. 6 to Pl.'s Cross-Mot., ECF No. 50-9. Notably, the administrative complaints rely extensively on the FEC's own

---

[4] According to the FEC, the matter ultimately was not expedited because "it was determined that no staff had sufficient time available at that juncture to complete a First General Counsel's Report for plaintiff's first administrative complaint within 30 days." Def.'s Reply, ECF No. 55 at 9.

records of the expenditures made by the NRA and its affiliates
through the common vendor shell companies in support of the
political candidates. *See Citizens for Percy '84*, 1984 WL 6601,
at *4 (finding delay unreasonable where "[m]uch of the
information in the complaint could be verified from the FEC's
own records"). The administrative complaints also include
"publicly available information demonstrating the links between
the shell companies used in the common vendor scheme, including
records held by the states in which those companies are
incorporated and do business"; Federal Communications Commission
records linking ad placements made by the common vendor shell
companies on behalf of the NRA entities and the political
candidates; and "public statements by candidates and
representatives of the common vendor." Pls.' Cross-Mot., ECF No.
48 at 15 (citing Ex. 1 to Pl.'s Cross-Mot., ECF No. 50-4; Ex. 2
to Pl.'s Cross-Mot., ECF No. 50-5; Ex. 3 to Pl.'s Cross-Mot.,
ECF No. 50-6; Ex. 4 to Pl.'s Cross-Mot., ECF No. 50-7; Ex. 5 to
Pl.'s Cross-Mot., ECF No. 50-8; Ex. 6 to Pl.'s Cross-Mot., ECF
No. 50-9). The administrative complaints appear to provide
sufficient evidence that would allow for the FEC to proceed
expeditiously with its enforcement process, and "there is no
indication that the replies from the respondents created any
difficult factual issues to cause unnecessary delay in acting on
the complaint." *Citizens for Percy '84*, 1984 WL 6601, at *3. The

FEC also does not dispute that the allegations within the administrative complaints are credible. *See* Def.'s Mot., ECF No. 41-1 at 28 (assuming that Plaintiff's claims are credible); *see also DSCC*, 1996 WL 34301203, at *5 (noting that "[a]t no time has the FEC contended that the allegations in MUR 3774 lacked credibility"); *Citizens for Percy '84*, 1984 WL 6601, at *3 (finding allegations credible where, among other things, "[t]he FEC makes no claim that the allegations were not believable").

## B. Nature of the Threat Posed by the Alleged Conduct

The nature of the threat posed by the alleged violations is significant due to the size of the alleged illegal contributions and the "threat" that the illegal activity will continue if unchecked. *See Citizens for Percy '84*, 1984 WL 6601, at *3 ("The significance of the threat posed by this violation comes not only from the size of the alleged illegal contributions, but also from the possibility of recurrence in the subsequent general election."); *DSCC*, 1996 WL 34301203, at *5 ("The threat to the electoral system is highlighted not only by the amounts of money involved and the impact upon close elections, but by the serious threat of recurrence."). Plaintiff alleges in its administrative complaints that, since 2014, the NRA-PVF and the NRA-ILA "have made millions of dollars in excessive, corporate, and unreported contributions to candidates for federal office, including Thom Tillis, Tom Cotton, and Cory Gardner in 2014, Ron

16

Johnson and Donald Trump in 2016, and Matt Rosendale and Josh
Hawley in 2018." Compl., ECF No. 1 ¶ 10. According to Plaintiff,
by coordinating with candidate campaigns to develop
advertisements through a common vendor using shell companies
associated with OnMessage and National Media, the NRA entities
"have made up to $35 million in contributions to candidate
campaigns since the 2014 election, in excess of the contribution
limits, in violation of the source restrictions, and without the
disclosure required under federal law." *Id.* ¶ 33. Included
within that amount is "up to $25 million in coordinated, illegal
contributions to the Trump campaign in 2016." *Id.* If Plaintiff's
allegations are true, the threat to the integrity of the
electoral process is "obvious." *Citizens for Percy '84*, 1984 WL
6601, at *3. Moreover, Plaintiff's series of complaints also
demonstrated to the FEC a threat of recurrence. For example, one
of Plaintiff's subsequent administrative complaints documented
allegations of coordinated expenditures by the NRA entities and
Matt Rosendale for Montana *after* the NRA entities were notified
of the first administrative complaint. *See* Pl.'s Cross-Mot., ECF
No. 48 at 18-19. Other than pointing out that the complaints
concern "economic and political issues" and not "the health or
welfare of plaintiff or any other person," the FEC does not
seriously contest Plaintiff's characterization of the nature of
the threat posed by the alleged conduct. But as discussed

further in Part III, Section F, "threats to the health of our
electoral processes also require timely attention." *DSCC*, 1996
WL 34301203, at *8. The Court thus finds that this factor weighs
in Plaintiff's favor.

### C. Availability of Information

As discussed above in Part III, Section A, Plaintiff
provided sufficient evidence to the FEC to establish the
credibility of its administrative complaints, and the FEC does
not contend that the availability of information has in any way
hampered its enforcement process. "[I]nformation in the
complaint[s] could be verified from the FEC's own records,"
*Citizens for Percy '84*, 1984 WL 6601, at *4; and other
information concerning the link between shell companies used in
the common vendor scheme was also in the public domain and
similarly accessible. The record also indicates that for each of
the MURs, the FEC promptly sent notifications to each of the
relevant parties. *See* Def.'s Mot., ECF No. 41-1 at 21-22.
Although "modest" extensions of time were sought for respondents
to send in their responses to the administrative complaints, the
agency received all of the documents by February 21, 2019. *Id.*
And with Plaintiff's submitted evidence and the responses in
hand, the Office of General Counsel was able to draft and submit
its FGCR to the Commission by May 10, 2019—two weeks ahead of
schedule. *Id.* at 22-23. Thus, there is nothing in the record to

suggest that the availability of information has contributed to any delay in the Commission's ability to expeditiously progress the matters.

### D. Complexity of the Case or Novelty of the Issues

Plaintiff's administrative complaints involve allegations concerning "millions of dollars in excessive, prohibited corporate, and unlawfully unreported contributions to federal candidates by coordinating political ad spending through the use of common vendors operating through a network of corporate shells." Def.'s Mot., ECF No. 41-1 at 20 (citing Compl., ECF No. 1 ¶ 10). Such allegations are not "novel": according to the FEC, the administrative complaints raise "issues common to many FEC matters." *Id.* at 29; *see also* Pl.'s Cross-Mot., ECF No. 48 at 25 (listing matters raising the same legal issues on the FEC's enforcement docket). Moreover, the regulations underlying Plaintiff's claim date back to the late 1970s. *See Citizens for Percy '84*, 1984 WL 6601, at *4 (finding, in 1984, that claims of coordinated spending were not novel because "[t]he regulations governing this activity were proposed and relied upon prior to the 1976 elections, and were formally promulgated in April, 1977").

Though not disputing that the issues presented are not novel, the FEC does contend, however, that the allegations "describe numerous complicated campaign finance law matters."

19

Def.'s Mot., ECF No. 41-1 at 28-29. Defendant argues that it has not unreasonably delayed consideration of the administrative complaints because the matters are "highly fact-specific" and complex. Def.'s Reply, ECF No. 55 at 28-29. Defendant further contends that "the scope and burden of a potential investigation is among the many factors that Commissioners properly consider at the reason-to-believe stage." *Id.* at 29. Plaintiff concedes that "the underlying complaints involve lengthy and detailed factual allegations." Pl.'s Cross-Mot., ECF No. 48 at 24. But Plaintiff argues that the Commission has all of the information it needs to make a reason-to-believe determination and that "the FEC cannot rely upon the fact that an *investigation* might be expansive in order to justify a refusal to decide to *start* an investigation." *Id.* at 25.

Here, the allegations presented in Plaintiff's four administrative complaints are undoubtedly factually complex, though not legally novel. *See Citizens for Percy '84*, 1984 WL 6601, at *4 (recognizing that coordinated contribution claims involve "analysis of a number of factors"). Any consideration of the allegations would also involve review of numerous lengthy and detailed documents—approximately 900 pages of complaints and responses, Def.'s Reply, ECF No. 55 at 28-29—in order to determine "not only . . . what factual disputes existed, but in addition, assuming the facts were as [Plaintiff] alleged,

whether they constituted violations of the [FECA]." *FEC v. Rose*,
806 F.2d 1081, 1091 (D.C. Cir. 1986). On the other hand,
however, the matters were not so complex that the FEC's Office
of General Counsel was not able to meet its deadline in
submitting their FGCR to the Commission—in fact, the staff
members submitted their report two weeks ahead of schedule. *See*
Def.'s Mot., ECF No. 41-1 at 22-23. In addition, by voting on
the issues at the February 23, 2021 executive session, *see*
Second Notice of Subsequent Developments, ECF No. 68; the
Commissioners have demonstrated that they have a firm grasp on
the complex issues at play in the administrative matters. Thus,
the Court does not find that the complexity of the issues has
been a significant factor in the Commissioners' failure to reach
a decision during executive sessions in the approximately seven
months since the February vote.

### E. Prejudicial Effect and Propriety of the Delay

Defendant argues that "although Giffords makes claims
encompassing many actors over three federal election cycles,
these claims all raise economic (and political) issues common to
many FEC matters, not human safety or welfare issues." Def.'s
Mot., ECF No. 41-1 at 29. Defendant therefore contends that this
factor does not weigh in favor of a finding of unreasonable
delay. Assuming for present purposes that political issues do
not concern human safety or welfare issues, the Court agrees

that the D.C. Circuit has instructed that "agency delay is least
tolerable" in cases "in which human health and welfare are at
stake." *Rose*, 806 F.2d at 1092 n.17. But it does not follow, as
Defendant suggests, that Plaintiff's interests and the public's
interests are only prejudiced if there is an imminent threat to
health and safety. Rather, courts in this District have
recognized that "threats to the health of our electoral
processes also require timely attention." *DSCC*, 1996 WL
34301203, at *8. Here, the administrative complaints include
allegations of "millions of dollars of illegal, unreported, and
excessive in-kind contributions," in violation of the FECA.
Compl., ECF No. 1 at 1. In view of the significant amount of
money at issue and the potential harms that could result if
Plaintiff's allegations are proven true, the FEC's failure to
reach a reason-to-believe determination more than three years
after the first administrative complaint was filed is
prejudicial.

Moreover, as Plaintiff points out, "the window in which the
FEC can act on [certain] violations is rapidly drawing to a
close." Pl.'s Mot. Expedite, ECF No. 69 at 2-3. "FECA itself
contains no explicit limitations period," and, "[a]s a result,
courts have applied the catch-all five-year limitations period
set forth in 28 U.S.C § 2462 to FECA enforcement actions brought
by the Commission." *Citizens for Responsibility & Ethics in*

22

*Wash. v. Am. Action Network*, 410 F. Supp. 3d 1, 23 (D.D.C. 2019). Here, "[t]o the extent the violations alleged in Plaintiff's complaints are considered individually, rather than as a pattern of illegal conduct by the NRA, the five-year limitations period for FEC enforcement may have elapsed for the violations committed during the 2014 cycle, and may be rapidly approaching for those committed during the 2016 cycle." Pl.'s Mot. Expedite, ECF No. 69 at 2-3. The FEC's delay in reaching a reason-to-believe determination thus also potentially prejudices Plaintiff if the FEC's delay ultimately contributes to a decision to dismiss Plaintiff's administrative complaints because the statute of limitations had expired or is about to expire. *See Citizens for Responsibility & Ethics in Wash. v. FEC*, 892 F.3d 434, 438 (D.C. Cir. 2018).

### F. Resources Available to the FEC and the Effect on Competing Priorities

The FEC contends that these factors weigh in its favor because it is "clearly entitled to deference in the allocation of its resources to meet its statutory obligations," Def.'s Mot., ECF No. 41-1 at 29 (quoting *DSCC*, 1996 WL 34301203, at *5); and it has "experienced a heavy workload and staffing pressures during the short period that [P]laintiff's matters have been pending," *id.* at 30. According to Defendant, the workload and pressures were even further exacerbated by the

partial government shutdown and by the FEC losing its quorum for over a year. *Id.* at 30-32; Def.'s Reply, ECF No. 55 at 25-27. Plaintiff acknowledges that the FEC is entitled to deference, but disputes that the government shutdown excuses the agency's delay. Pl.'s Cross-Mot., ECF No. 48 at 22-23. Plaintiff also argues that FEC's "citation to its generally heavy workload as a justification for delay is belied by the evidence." *Id.* at 23. For example, Plaintiff points to public statements by FEC Chair Ellen L. Weintraub that "[b]efore losing the quorum on September 1, the Commission was making progress to reduce its significant enforcement backlog (even despite the government shutdown that disabled the FEC for most of January)." *Id.*

The Court agrees that "[t]he FEC is clearly entitled to deference in the allocation of its resources to meet its statutory obligations, particularly in this era of shrinking resources." *DSCC*, 1996 WL 34301203, at *5. "It is not for the judiciary to ride roughshod over agency procedures or sit as a board of superintendence directing where limited agency resources will be devoted." *Rose*, 806 F.2d at 1091; *see also In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991) ("[R]espect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."). This is especially so when the Court views the present

litigation in the context of the circumstances the FEC has faced
since Plaintiff filed its administrative complaints.
Consideration of the complaints was first disrupted, even if
minimally so, by the partial government shutdown that ran from
December 2018 to January 2019. Def.'s Mot., ECF No. 41-1 at 30.
In addition, the FEC lacked a quorum for approximately 16 months
after the FEC's Office of Legal Counsel submitted its FGCR to
the Commission, rendering the agency unable to act on the issues
during that time. *See* Notice Regarding FEC's Quorum, ECF No. 65.
As a result, when the FEC regained its quorum in December 2020,
it faced a considerable backlog of old and new administrative
enforcement matters. *See* FEC's Notice Subsequent Developments,
ECF No. 66 at 1 (noting that, as of September 30, 2020, there
were 388 pending matters and a backlog of 200 reports pending
with Commissioners). The Court thus does not doubt that the
Commissioners have "experienced a heavy workload and staffing
pressures" during the time since Plaintiff filed its
administrative complaints with the agency. Def.'s Mot., ECF No.
41-1 at 30.

However, it is also true that "[w]hatever deference an
agency is due in resource allocation decisions, it is entitled
to substantially less deference when it fails to take any
meaningful action within a reasonable time period." *DSCC*, 1996
WL 34301203, at *5; *see also id.* ("While the Court is mindful of

the discretion due the FEC and all agencies in allocating resources, such discretion is not a shield from judicial review of whether the agency has fulfilled its statutory obligations."). And at the current stage of the FEC's enforcement proceedings, there is no evidence suggesting that challenges in the FEC's allocation of resources or the effect that expediting this matter would have on competing priorities are causing the delay in consideration of Plaintiff's administrative complaints. After all, despite the unique circumstances the FEC has faced since late 2018, the FEC's Office of Legal Counsel was able to submit its FGCR 14 days ahead of schedule, and within two months of the FEC regaining its quorum in December 2020, the Commissioners were able to conduct two rounds of votes on Plaintiff's matters. *See* Def.'s Mot., ECF No. 41-1 at 23; FEC's Second Notice of Subsequent Developments, ECF No. 67 at 1-2. Since the last deadlocked vote on February 23, 2021, however, the Court is unaware of any action the Commissioners have taken to put the relevant MÜRs back on the agenda for renewed discussion, and the FEC has not provided a reason for not doing so. *See* FEC's Second Notice of Subsequent Developments, ECF No. 67 at 2. Although the Court acknowledges that the FEC has "more than one case on its docket" to consider during its executive sessions, *Rose*, 806 F.2d at 1081; the FEC cannot ignore its statutory obligations by

26

allowing a matter to languish for months following an
inconclusive vote. Accordingly, the Court finds that this factor
weighs in favor of Plaintiff.

### G. Statutory Time Constraints

"Congress did not intend to create a presumption that delay
in excess of 120 days was unreasonable, per se, or that 120 days
was a deadline for final action on complaints." *Citizens for
Percy '84*, 1984 WL 6601, at *4. The D.C. Circuit has also
explained that the FEC is not required to complete final action
on an investigation within a two-year election cycle. *See Rose*,
806 F.2d at 1092 n.17 (stating two-year delay in completing an
administrative complaint was not "contrary to law"); *In re
National Cong. Club*, 1984 WL 148396, at *1 (explaining no
presumption that a two-year delay was "contrary to law").
However, although "Congress did not impose specific time
constraints upon the Commission to complete final action, . . .
it did expect that the Commission would fulfill its statutory
obligations so that the Act would not become a dead letter."
*DSCC*, 1996 WL 34301203, at *7. As the court in *DSCC* explained:

> [W]hile there are no specific deadlines to
> prod the FEC to forward administrative
> complaints to the Commissioners for "reason to
> believe" determinations, it is clear that the
> agency must nevertheless act reasonably,
> determination of which includes consideration
> of the underlying statutory purposes. The
> absence of a specific requirement in the Act
> that the Commissioners make their finding

27

> within a certain time period is not the
> equivalent of unfettered FEC discretion to
> determine its own time line. Public confidence
> in our democratic electoral system, which the
> Act seeks to protect, turns on investigations
> that are conducted within a reasonable time
> and on effective enforcement. The deterrent
> value of the Act's enforcement provisions are
> substantially undermined, if not completely
> eviscerated, by the FEC's failure to process
> administrative complaints in a meaningful time
> frame.

*Id.* at *8. Thus, although there is no statutory time limit

placed on Defendant to complete its review of Plaintiff's

matter, its actions cannot be unreasonable.

### H. "Rule of Reason"

Finally, Defendant argues that the "months during which the

administrative complaints are alleged to have been pending are

plainly not unreasonable periods." Def.'s Mot., ECF No. 41-1 at

27. Defendant notes that the agency's "goal" to complete most

enforcement matters is "within 15 months" of receipt, with the

expectation that some matters could take longer. *Id.* Defendant

further argues that the Court must judge the Commission's

reasonableness in total, and not just look at the period of time

after the FGCR was submitted. Def.'s Reply, ECF No. 55 at 21.

Plaintiff, for its part, does not dispute that the FEC worked at

a "reasonable pace" in preparing and submitting the FGCR to the

Commission ahead of deadline. *See* Pl.'s Cross-Mot., ECF No. 48

at 17-18 (noting that the "initial stage of the enforcement

proceedings" proceeded at a "reasonable pace," but that the "progress came to a halt when the matters were turned over to the Commission"). Instead, Plaintiff places the blame for any delay on the shoulders of the Commissioners, arguing that their failure to act has triggered a "regulatory breakdown." *Id.* at 26.

In determining whether agency inaction is arbitrary and capricious, a rule of reason applies. *See DSCC*, 1996 WL 34301203, at *9. Here, evidence with regard to the Commission's reasonableness in handling the administrative complaints is mixed. On the one hand, the Commission is not "solely responsible for the time consumed" by its analysis of whether to find a reason to believe exists. *Common Cause*, 489 F. Supp. at 738. There is no dispute between the parties that the FEC acted reasonably up until May 10, 2019, when the Office of Legal Counsel submitted its FGCR to the Commission. Once the FGCR was received, the Commission then discussed the matters in multiple executive sessions over a period of two months without taking a vote; soon after these executive sessions, however, the agency lost its quorum as to the matters. *See* Def.'s Reply, ECF No. 55 at 22-23. Per statute, the Commission was incapable of addressing Plaintiff's complaints while it was without a quorum for approximately 16 months. *See id.* at 24. Once it regained quorum in December 2020, the Commissioners began to deliberate

on the administrative complaints within weeks, and it held a
vote on two of the MURs on February 9, 2021. *See* FEC Notice
Subsequent Developments, ECF No. 66. Though the February 9 vote
was inconclusive, the FEC held a series of votes related to the
four administrative matters again on February 23, 2021. *See*
FEC's Second Notice of Subsequent Developments, ECF No. 67 at 1-
2. At that meeting, the FEC (1) failed to find reason to believe
violations occurred, (2) failed to find *no* reason to believe
violations occurred, and (3) rejected a motion to close the
enforcement matters. *Id.* In view of the above, the Commission's
actions up until February 23, 2021, appear to be substantially
justified.

On the other hand, however, there is no evidence before the
Court indicating that the FEC has taken any actions to discuss
or to vote on the matters again during any subsequent executive
session since February 23, 2021. *Id.* (noting that the Commission
had met in executive session on March 9 and 11, 2021, and that
the administrative complaints were not on the agenda). Neither
has the FEC assured the Court "that it is moving expeditiously"
to address the claims. *TRAC*, 750 F.2d at 80. Particularly in
view of the fact that the Commissioners have already conducted
one vote on all MURs at issue and two votes on two of the MURs—
thereby demonstrating that the Commissioners have carefully
considered and understand the facts, legal issues, and interests

30

at stake—the Court cannot find that the FEC's failure to take any action on the matters during the past 7 months is reasonable. "Such dilatory conduct is not explained and cannot be condoned if the statute is to have any meaning." *Citizens for Percy '84*, 1984 WL 6601, at *4.

## IV.   Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion and **DENIES** Defendant's motion. Pursuant to 52 U.S.C. § 30109(a)(8)(C), Defendant is hereby ordered to conform to the Court's Order within 30 days of the entry of the Order by making the reason-to-believe determination set forth in 52 U.S.C. § 30109(a)(2). The Court shall retain jurisdiction over this matter until Defendant takes final agency action with respect to Plaintiff's administrative complaints. *See Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001); *Alegent v. Health-Immanuel Med. Ctr. v. Sebelius*, 917 F. Supp. 2d 1, 3 (D.D.C. 2012). An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:      Emmet G. Sullivan
              United States District Judge
              September 30, 2021**